UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARK S., | : |
| | : |
| *Plaintiff*, | : |
| | : |
| v. | :  No. 3:23-cv-1221 (SDV) |
| | : |
| KILOLO KIJAKAZI, | : |
| | : |
| *Defendant*. | : |

## RULING ON PLAINTIFF'S MOTION TO REVERSE DECISION OF COMMISSIONER AND DEFENDANT'S MOTION TO AFFIRM

Plaintiff appeals from the administrative decision of the Commissioner of the Social Security Administration denying his application for supplemental security income. For the reasons below, plaintiff's Motion to Reverse, ECF 17, is DENIED and the Commissioner's Motion to Affirm, ECF 19, is GRANTED.

### A. LEGAL STANDARDS

#### 1. Disability and eligibility

A claimant is disabled under the Social Security Act if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Title XVI provides for supplemental security income benefits to claimants who are indigent and disabled, without reference to prior work. *See* 42 U.S.C. § 1381 *et seq*.

#### 2. Commissioner's five-step review

The Commissioner of Social Security is authorized to make findings of fact and decide disability applications, *see* 42 U.S.C. § 1383(c)(1)(A), in accordance with the five-step

sequential evaluation process provided in 20 C.F.R. § 416.920. (1) First, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. (2) If not, the Commissioner determines whether the claimant has a medically determinable impairment or combination of impairments that are "severe," meaning that it "significantly limits" the claimant's physical or mental ability to do basic work activities. (3) If the claimant has a severe impairment or combination of impairments, the Commissioner evaluates whether, based solely on the medical evidence, the claimant has an impairment that "meets or equals" an impairment listed in Appendix 1, Subpart P, No. 4 of the regulations (the "Listings") and that either is expected to result in death or has lasted or will last for at least 12 months. [1] If so, the claimant is disabled. (4) If not, the Commissioner determines whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his or her past work. [2] (5) If not, the Commissioner determines whether there is other work in the national economy which the claimant can perform in light of his or her RFC, age, education, and work experience. *See* 20 C.F.R. § 416.920. The claimant bears the burden of proof on the first four steps, and the Commissioner bears the burden of proof on the final step. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

The Commissioner's authority to make these findings and decisions is delegated to an administrative law judge ("ALJ"). *See* 20 C.F.R. § 416.1429. A claimant may request review of an ALJ's decision by the Appeals Council. *See* 20 C.F.R. § 416.1467. If the Appeals Council

---

[1] *See* 20 C.F.R. § 416.909 (durational requirement).

[2] Residual functional capacity is the most a claimant can do in a work setting despite his or her limitations. 20 C.F.R. § 416.945.

declines review or affirms the ALJ's decision, the claimant may appeal to the United States District Court.  42 U.S.C. §§ 405(g), 1383(c)(3).

### 3. Court's review on appeal

A district court reviewing the Commissioner's final decision is performing an appellate function, *see Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981), and has the power to affirm, modify, or reverse the Commissioner's decision based on its review of the briefs and the administrative record.  *See* 42 U.S.C. § 405(g).  "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error."  *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

## B. BACKGROUND

### 1. Procedural History

In April 2016, plaintiff filed a Title XVI application for supplemental security income alleging a disability onset date of January 1, 2012.  R. 196-27.  The claim was denied after initial review and on reconsideration, and plaintiff requested a hearing.  R. 110, 128, 140.  On May 2, 2018, ALJ Louis Bonsangue postponed the hearing to allow plaintiff time to seek legal representation.  R. 46-62.  Plaintiff did not retain counsel, and he appeared *pro se* at the hearing on August 13, 2018, during which the ALJ took testimony from plaintiff and a vocational expert.  R. 63-94.  On May 1, 2019, the ALJ issued a written decision denying plaintiff's claims.  R. 9-20.  Plaintiff's request for review was denied by the Appeals Council, R. 2-3.  In October 2020, plaintiff sought an extension of time to appeal, R. 36-37, which was granted in August 2023, R. 26.  Plaintiff filed this action on September 18, 2023.

## 2. Personal history

Plaintiff was 46 years old on the date of his April 2016 application.  In his early years, after some chronic absenteeism and disengagement in ninth grade that resulted in a psychological evaluation, plaintiff successfully adjusted and completed high school in 1987.  R. 70, 300-304, 343.  After high school, he gradually completed college courses over several years, earning a bachelor's degree in Spanish from Central Connecticut State University.  R. 71.  During that time, plaintiff lived for short periods in Central and South America.  R. 544-45.  Plaintiff's work history is minimal, and he last worked in 2008 selling janitorial services.  R. 65, 205-208.  He has lived alone in an apartment owned by his mother for more than 15 years.  R. 72, 197.

## 3. Overview of mental and neurological conditions

The Court assumes familiarity with the medical record and hearing testimony.  Plaintiff's primary impairments are depression, anxiety, PTSD, and substance abuse.  The treatment record is sparse.  It includes an ER visit for alcohol withdrawal and alcohol-related seizures in August 2014, R. 372-73; five days of inpatient psychiatric treatment between December 30, 2015 and January 4, 2016 for depression, anxiety, and suicidal ideation, R. 481-84; a few days of intensive outpatient treatment in January 2016, which plaintiff unilaterally discontinued, R. 506-07; an outpatient clinic visit in April 2016 seeking assistance with a Social Security disability form, R. 730-31; a three-day hospital stay in September 2016 for diplopia (double vision) and ataxic gait attributed to alcohol-induced thiamine deficiency, R. 716-19; and another brief stint in intensive outpatient treatment in August and September 2017 that plaintiff again discontinued against advice, R. 740.

Of the five consultative examinations procured by the Commissioner, three pertained to mental health. In December 2015, psychologist Jaimie Burns, Psy.D. examined plaintiff and opined that his prognosis was "fair to poor given his history of mood symptoms, anxiety symptoms, and PTSD symptoms." R. 383. In June 2016, psychologist Marc Hillbrand, Ph.D. noted that plaintiff had struggled for years with severe substance use disorders and with symptoms of posttraumatic stress disorder and severe depression, but found plaintiff to be cognitively globally intact while noting that "[w]orking memory may be an area of slight relative weakness." R. 540. In February 2017, Andrew Pleshkevich, Ph.D. performed a cognitive evaluation, which plaintiff did not complete due to acute dizziness, and identified depression, PTSD, anxiety, and substance abuse disorders as plaintiff's potential diagnoses. R. 548.

**4. The ALJ's decision**

In his October 2022 decision, the ALJ found that plaintiff had the following severe mental impairments: depressive disorder, anxiety disorder, panic disorder, posttraumatic stress disorder, substance use disorder, and epilepsy/alcohol withdrawal seizures. R. 11. The ALJ also considered plaintiff's allegations of back pain and obstructive sleep apnea but concluded that these were non-severe, both because the medical record did not establish a medically determinable impairment and because they did not cause more than a minimal limitation on plaintiff's ability to perform basic work activities. R. 11-12. After finding that plaintiff's impairments did not meet or medically equal a listed impairment, R. 12-14, the ALJ then determined that plaintiff had the residual capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations:

> he can never climb ropes, ladders, or scaffolds; can occasionally balance; must avoid all exposure to moving parts and unprotected heights; is able to interact adequately with coworkers while completing simple, routine, repetitive tasks; cannot work with the public; and can only tolerate minor changes in work routine.

5

R. 14-19. At Step 4, the ALJ found that the plaintiff had no past relevant work and concluded at Step 5 based on vocational expert testimony that there were jobs that exist in significant numbers in the national economy that plaintiff could perform. R. 19-20. The ALJ therefore concluded that plaintiff was not disabled under the Social Security regulations.

### C. DISCUSSION

Plaintiff raises four claims of error on this appeal: (i) the ALJ's paragraph B findings were unsupported; (ii) the ALJ should have found medically determinable impairments of generalized brain atrophy, mild neurocognitive disorder, and schizophrenia; (iii) the RFC was not supported by substantial evidence; and (iv) the ALJ's hypothetical to the vocational expert did not include all impairments. For the reasons below, the Court finds no legal or factual error.

#### 1. ALJ's paragraph B findings

Plaintiff's first claim of error is that the record lacks substantial evidence to support the ALJ's Step 3 finding that he did not have a listed impairment. Specifically, plaintiff contends that the ALJ's paragraph B findings were unsupported. ECF 17-1 at 5-12. When evaluating a mental impairment, the ALJ must analyze the so-called paragraph B criteria as part of the psychiatric review technique used at Step 2 to determine the severity of mental impairments and used at Step 3 to determine whether the claimant has a listed impairment that automatically qualifies as disabling. *See* 20 C.F.R. § 416.920a. The relevant listings in this case are 12.04 (depression), 12.06 (anxiety/panic), and 12.15 (PTSD). In order to meet the paragraph B criteria for listings in section 12.00, a claimant must have an extreme limitation, or two marked limitations, in (i) understanding, remembering, or applying information; (ii) interacting with others; (iii) concentrating, persisting, or maintaining pace; or (iv) adapting or managing oneself. *See* Appendix 1 to 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Listings") § 12.00.

The ALJ found in relevant part that plaintiff had a marked limitation in interacting with others; a moderate limitation in concentration, persistence, and pace; and a moderate limitation in adapting or managing for himself.  R. 12-13.  Regarding concentration, persistence, and pace, plaintiff contends that the "moderate" finding should have been "marked," citing his own reports of frequent suicidal thoughts (R. 380, 539), hallucinations (R. 381, 749), night terrors (R. 380, 508), paranoia (R. 381, 749), and hiding beneath the covers of his bed for days at a time. (R. 380, 402, 543-44).  ECF 17-1 at 8.  He also cites an observation from an outpatient hospital visit for psychiatric complaints in April 2016 that he had "mental pauses with word finding."  R. 732, cited in ECF 17-1 at 8.  Regarding his ability to adapt or manage himself, plaintiff again contends that the "moderate" finding should have been "marked," citing his own reports that he does not keep up with personal hygiene (R. 427) as well as observations from certain appointments at which he was "not well-groomed" (R. 382), "disheveled" (R. 508), and "had a very strong body odor" and "wore pajama like clothing" (R. 227).  ECF 17-1 at 10.  He also cites his own reports indicating that he hides at home and drinks to manage his depression, anxiety, and PTSD.  ECF 17-1 at 10.

However, the existence of some evidence that could support plaintiff's position does not answer the question of whether the ALJ's findings were supported by substantial evidence.  "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing *Schauer v. Schweiker*, 675 F.2d at 57).

Plaintiff attended five consultative examinations, and none of the examiners suggested that plaintiff's limitations were as severe as he asserts in his brief.  In terms of directly

observable indicators, he displayed the most severe symptoms in a December 2015 examination by psychologist Dr. Burns, insofar as he was not well groomed and his thought process was tangential at times.  R. 382.  According to plaintiff, Dr. Burns was concerned enough that she referred him to the hospital for a psychiatric evaluation, R. 481, at which time he spent several days inpatient due to some suicidal ideation, R. 487.  Nonetheless, Dr. Burns did not assess the sort of marked limitations that plaintiff argues in his brief but, rather, opined that his attention and concentration were only "mildly" impaired and that he "may" struggle to "manage his stress levels effectively" but also might be able to manage his own funds.  R. 383.  This opinion is consistent with the ALJ's finding of moderate limitations in concentration, persistence, and pace and in adapting or managing himself.

  The other opinions were even less supportive of plaintiff's contention that his limitations in these two functional areas were "marked."  In January 2016, internist Robert Dodenhoff, M.D., did not note any neurological deficit or any negative mental status observations, and concluded that plaintiff "is able to understand, remember and carry out instructions" and "should be able to respond appropriately to supervision, coworkers and the pressures in a work setting."  R. 524.  In June 2016, internist Anthony Roselli, M.D., observed: "The claimant was alert and oriented.  Mood is neutral.  Affective range is intact.  There is no psychomotor restless or expressed anxiety.  Speech is clear and coherent.  Verbal content is appropriate.  Memory, concentration, and general fund of knowledge are intact.  Insight and judgment are intact."  R. 531.  Also in June 2016, psychologist Dr. Hillbrand concluded in relevant part that plaintiff was incapable of managing his benefits in light of his reported history, but he was cognitively globally intact with some slight relative weakness in working memory, and opined that "[h]is ability to comprehend, retain, and carry out complex tasks is moderately impaired," R. 540,

which is less than marked. Lastly, in February 2017, psychologist Dr. Pleshkevich concluded that plaintiff could manage his own benefits, and the only limitation he found was a moderate to severe limitation in interacting with others. R. 548.

When state agency psychologists Jan Jacobson, Ph.D., and Adrian Brown, Ph.D., analyzed the paragraph B criteria on initial review and reconsideration, they opined that plaintiff's limitations in the two functional areas in question were no more than moderate. R. 103, 106-107, 120, 123-25. Furthermore, in the ALJ's own paragraph B discussion, he credited plaintiff's reports of depression, low motivation, anxiety, panic, and intrusive thoughts and also acknowledged that plaintiff presented with disorganized thoughts at times, but then pointed to other evidence showing that plaintiff was able to concentrate, was able to manage daily activities living by himself, and had not required any extensive clinical treatment. R. 13. All this evidence provides substantial support for the ALJ's finding that plaintiff had "moderate" limitations in concentration, persistence, and pace and in adapting or managing himself, and the Court finds no factual error in the ALJ's paragraph B findings.

**2. ALJ's evaluation of medically determinable impairments**

Plaintiff's second claim of error is that the ALJ failed to consider or discuss (a) evidence of generalized brain atrophy and (b) provisional diagnoses of mild neurocognitive disorder and schizophrenia made by Jessica Antunes, LPC. ECF 17-1 at 12-17.

The record includes two imaging studies of plaintiff's brain. In August 2014, a CT scan showed mild generalized volume loss and periventricular white matter low attenuation, and demyelination features greater than anticipated for the patient's age. R. 372. In September 2016, an MRI was ordered based on complaints of diplopia and ataxic gait, which showed generalized atrophy with moderately extensive chronic small vessel ischemic disease. R. 617, 707.

9

Subsequently, at an August 2017 intake for intensive outpatient treatment at Community Mental Health Affiliates, counselor Jessica Antunes, LPC assessed possible mild neurocognitive disorder due to traumatic brain injury based on plaintiff's report of boxing in his youth and based on "behaviors and disorganization of thoughts during time of intake." R. 750-51. She recommended "further neuro-testing due to long term boxing sport as he reports he did for several years as it may have resulted in head trauma." [3] R. 751. Ms. Antunes also concluded without further explanation that plaintiff "meets criteria for Schizophrenia." R. 751. However, plaintiff discontinued the counseling program almost immediately. R. 740.

Plaintiff argues that the ALJ should have analyzed whether the brain imaging and Ms. Antunes' diagnoses demonstrated the existence of a medically determinable impairment at Step 2, and then should have addressed them further when determining whether plaintiff had a listed impairment at Step 3 and when determining whether plaintiff's functional limitations prevented him from working at Step 5. However, even assuming that the ALJ did not adequately address this evidence, it would have been harmless error at most because it still would not have established the existence of a medically determinable impairment.

> To be medically determinable under the regulations, an impairment
>
> must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Therefore, a physical or mental impairment must be established by objective medical evidence from an *acceptable medical source*. We will not use

---

[3] The record also indicates that plaintiff had a motorcycle accident at age 17 but there is no reliable evidence of a resulting TBI. *See* R. 380 ("He reports that he was in a motorcycle accident in 1987 and sustained a broken ankle, crushed bones in his foot, and bruises. He denies having a head injury."); R. 392 (reporting 1987 motorcycle accident with left foot injury); R. 713 ("foot surgery with hardware after motorcycle accident at age 17"). One note suggests in passing that plaintiff was "post TBI from motorcycle accident" but cites no basis for this description. R. 428. And plaintiff reported to one consultative examiner "having lost consciousness when he hit his head during a motorcycle accident" but the issue was not further explored by the examiner. R. 543-48.

10

> your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).

20 C.F.R. § 416.921 (emphasis added). A counselor such as Ms. Antunes is not an acceptable medical source as defined in 20 C.F.R. § 416.902, so her assessments of mild neurocognitive disorder and schizophrenia were insufficient to establish that plaintiff had such impairments. Moreover, Ms. Antunes' diagnoses were provisional: she specifically noted that "more assessments will be needed" to establish a neurocognitive impairment and described her assessments as the "current diagnosis at this time" based solely on plaintiff's "behaviors and responses" at the August 2017 intake. R. 751, 756. Not only was there no follow-up assessment, but plaintiff left the treatment program almost immediately, and there is no suggestion of cognitive impairment or schizophrenia elsewhere in the medical record. [4] In fact, at the February 2017 consultative examination, Dr. Pleshkevich found plaintiff's cognitive ability to be "average" and did not mention any psychosis in his opinion. R. 543-48. Consequently, Ms. Antunes' diagnoses of mild neurocognitive disorder and schizophrenia would not have moved the needle, even if they were explicitly addressed in the ALJ's written decision.

As for brain atrophy, there was no omission in the analysis: ALJ's decision acknowledged the September 2016 MRI (R. 15) but went on to cite evidence throughout the decision showing that plaintiff did not have neurological or cognitive deficits. R. 13, 15-18. Although the ALJ did not mention the August 2014 CT scan, that evidence was cumulative of

---

[4] In April 2016, plaintiff went to an outpatient clinic for "filling out a form for his social security disability." R. 730. Internist Sophie Korzan, M.D., labeled his report of depression, anxiety, and night terrors as "multiple psychiatric conditions," stated "I am concerned for this patient," and also wrote: "Pt has been wearing the same contact lenses for over a year without taking them out, there is clearly a psychiatric component." R. 733. Although she referred him to a psychiatric clinic, Dr. Korzan made no formal diagnosis of psychosis, and plaintiff did not seek follow-up testing or treatment. *Id.*

the MRI insofar as both images depicted the same condition (brain atrophy) that plaintiff now argues was a medically determinable impairment. "[A]n ALJ is not required to discuss every piece of evidence submitted" and a "failure to cite specific evidence does not indicate that such evidence was not considered." *Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012) (citation and quotation marks omitted). Lastly, to the extent that plaintiff is claiming that the CT scan and MRI establish the existence of a medically determinable impairment, the record indicates otherwise. On review of the September 2016 MRI, which was taken during a three-day hospital stay instigated by an episode of double vision, the attending physician characterized the imaging as "normal" and observed that plaintiff "denies daily [alcohol] use but his serum tests and MRI brain are consistent with alcoholism." R. 707. Other providers during that hospital stay referred to the MRI as "unremarkable" and "OK." R. 610, 640. Furthermore, neurological findings throughout the record were normal, R. 359, 418, 524, 531, 592, 705, 718, 732, except for when plaintiff was in alcohol withdrawal in August 2014, R. 365, and in Ms. Antunes' outlier assessment in August 2017, R. 751. Similarly, plaintiff's cognitive abilities were found to be "average" throughout the record, R. 382, 539-40, 545, 548, except for Ms. Antunes' outlier assessment, R. 756.

In short, the evidence does not establish the existence of a medically determinable impairment, so the claim that the ALJ failed to adequately analyze it is unavailing.

**3. Substantial evidence for the RFC**

Plaintiff's third claim is difficult to parse insofar as it is an amalgam of several legal theories. At base, plaintiff contends that the record lacks substantial evidence to support the ALJ's RFC determination. However, he also argues that the ALJ accorded too much weight to the opinions of non-examining agency consultants, ECF 17-1 at 18-20, and that the record lacked

a "required medical opinion," *id.* at 20-23, which seem to be independent theories of error. Examining these arguments in reverse order, none of them is availing under the circumstances.

### a. Development of opinion evidence

The Court construes plaintiff's assertion that the record lacked a "credit-worthy medical opinion" as an indirect claim that the ALJ committed legal error by failing to adequately develop the record, as opposed to a factual error in interpreting the evidence. Indeed, several of the cases that plaintiff cites on this issue actually address such a "gap in the record" claim. *See* Pl. Br., ECF 17-1 at 20-23 (citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (ALJ has duty to develop record that has obvious gap); *Mungin v. Saul*, No. 3:19-cv-233 (RMS), 2020 WL 549089, at *9-10 (D. Conn. Feb. 4, 2020) (remanding due to gap in medical opinion record); *Sanchez v. Colvin*, No. 13-cv-6303 PAE, 2015 WL 736102, at *8 (S.D.N.Y. Feb. 20, 2015) (same)). However, there is not even an arguable gap in the medical opinion record here. Due to plaintiff's sporadic and sparse treatment history, he has no longitudinal relationship with any treating physician. Consequently, the best the ALJ could do to develop the opinion record was to procure consultative examinations, of which there were five in this case – two by internists (Drs. Dodenhoff and Roselli) and three by psychologists (Drs. Burns, Hillbrand, and Pleshkevich). This amounts to an abundance of medical opinion evidence, not a deficiency.

### b. Weight assigned to medical opinions

Plaintiff next argues that the ALJ improperly accorded more weight to the mental health opinions of non-examining physicians (the state agency reviewers) than to the opinions of consultative examiners (Burns, Hillbrand, and Pleshkevich). This theory fares no better for several reasons. *First*, the argument is internally inconsistent insofar as plaintiff suggests that the CEs were due more deference by nature of having actually interacted with him, but then cites a

Second Circuit holding that an ALJs should not rely heavily on CE findings, especially in the mental illness context, because a single visit may not be indicative of a claimant's "longitudinal mental health." *See Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019). *Second*, as noted above, plaintiff had no treatment relationships of any duration, just a series of one-off visits with various providers, so CE opinions were the next best option. *Third*, plaintiff incorrectly asserts that "[t]here may be no reliance whatsoever on a non-examining opinion, particularly as to non-exertional mental health limitations." *See* ECF 17-1 at 19. Although it is true that opinions of examiners were generally given more weight than non-examiners under the old regulation, which applies to this case because the application was filed prior to March 27, 2017, *see* 20 C.F.R. § 416.927(c)(1), the ALJ's ultimate obligation under that rule was to weigh all opinions based on their supportability (with evidence cited in the opinion) and consistency (with evidence in the record as a whole), *see* 20 C.F.R. § 416.927(c)(2)-(4).[5] In other words, the prior regulation "permit[ted] the opinions of non-examining sources to override treating sources' opinions provided they [were] supported by evidence in the record," *Camille v. Colvin*, 652 F. App'x 25, 28 (2d Cir. 2016) (citation and quotation marks omitted), which contradicts plaintiff's assertion. *Fourth*, the only actual disagreement with the ALJ's analysis of opinions that plaintiff articulates concerns his degree of limitation in interacting with others. ECF 17-1 at 20. In that respect, the relevant portions of the medical opinions and the weight assigned by the ALJ were as follows:

- *Initial reviewer Dr. Jacobson* (great weight): Moderate social limitation, except marked limitation in interacting with the public. R. 106.

- *Reconsideration reviewer Dr. Brown* (great weight): Moderate limitation in interacting with public only. R. 124.

- *CE Dr. Burns* (great weight): "He may struggle to relate well to others." R. 383.

---

[5] Likewise, under the current regulation, supportability and consistency remain the "most important factors" in determining the weight of a medical opinion. *See* 20 C.F.R. § 416.920c(a).

- *CE Dr. Hillbrand* (partial weight): Marked limitation in interacting with supervisors, coworkers, and public.  R. 540.

- *CE Dr. Pleshkevich* (partial weight): Moderate to severe limitation in interacting with supervisors, coworkers, and public.  R. 548.

The ALJ's RFC determination demonstrates that he agreed with Drs. Jacobson, Hillbrand, and Pleshkevich that plaintiff was markedly limited in interacting with the public.  *See* R. 14 ("cannot work with the public").  As for interactions with supervisors and coworkers, the ALJ found Dr. Pleshkevich's "moderate to severe" opinion to be poorly supported given the CE's own finding that plaintiff was pleasant and gregarious, and found Dr. Hillbrand's opinion to be inconsistent with the record of plaintiff's typical interactions with providers.  R. 18.  Given that Dr. Hillbrand's opinion is more extreme than others, and given that Dr. Pleshkevich's own opinion was inconclusive as to whether the social limitation was moderate or extreme, and in light of the overall record – including other medical opinions that plaintiff's social limitations were not marked, and evidence that plaintiff's interactions with providers and with the ALJ were socially appropriate – the ALJ's assignment of weights satisfies the substantial evidence standard.

      **c. Substantial evidence supports the RFC determination**

Turning to plaintiff's general argument that the RFC determination was not supported by substantial evidence, he incorrectly asserts that "the RFC found in the Decision is based on nothing more than the ALJ's own expertise on matters of medicine."  ECF 17-1 at 19.  It is true that an ALJ "cannot arbitrarily substitute his own judgment for competent medical opinion," *see McBrayer v. Sec'y of Health & Hum. Servs.*, 712 F.2d 795, 799 (2d Cir. 1983), and district court decisions have reasoned that an ALJ's rejection of medical opinions, even if appropriate, does not enable the ALJ to conclude that a claimant's abilities were greater than stated in those

15

opinions absent some other affirmative medical evidence to support that conclusion. *See Borrero v. Saul*, No. 3:19-cv-1306 (TOF), 2020 WL 7021675, at *8 (D. Conn. Nov. 30, 2020); *see also Cook v. Comm'r of Soc. Sec.*, 818 F. App'x 108, 109-10 (2d Cir. 2020) (record need not necessarily contain "medical opinion providing the specific restrictions reflected in the ALJ's RFC determination" but must nonetheless "'contain sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity'") (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013)). But that is not what the ALJ did here.

As discussed above, although the ALJ diverged from some medical opinions regarding plaintiff's social limitations, other opinions and non-opinion medical evidence supported his conclusion on that point. Otherwise, the ALJ's only other divergence from the medical opinions was favorable to plaintiff, insofar as he disagreed with Dr. Pleshkevich's opinion that plaintiff had "no impairment in the ability to understand and carry out instructions." R. 18. Instead, based on other medical opinions and medical evidence, the ALJ assigned a more restrictive RFC of "simple, routine, repetitive tasks." R. 14. Consequently, there is no basis to plaintiff's allegation that the ALJ substituted his own judgment for competent medical opinions.

Lastly, to the extent that plaintiff is arguing that the ALJ failed to acknowledge his limitations or address his ability to work on a sustained basis despite those limitations, *see* ECF 17-1 at 18, 22-24, the ALJ's decision demonstrates otherwise. The ALJ acknowledged that plaintiff has some symptoms of anxiety, depression, nightmares, intrusive thoughts, some trouble with memory and concentration, occasional tangential and disorganized thoughts, and some agitation and paranoia but found substantial evidence that plaintiff's symptoms were not as limiting as alleged, including that plaintiff rarely sought treatment; was cognitively intact; was able to cooperate with medical providers; and lived alone while taking care of his own personal

needs. R. 18. The ALJ cited evidence from the medical records to support these conclusions, which are generally consistent with the opinions of consultative examiners and the agency reviewers as discussed above. For all these reasons, the ALJ's RFC evaluation satisfied the substantial evidence standard.

### 4. Adequate hypothetical to the vocational expert

Plaintiff's final claim of error is that if the ALJ's hypothetical to the vocational expert was flawed because it was based on the RFC determination that plaintiff claims was erroneous. However, because the Court found that the ALJ's RFC analysis was adequate and was supported by substantial evidence, the fourth claim of error is moot.

### D. CONCLUSION

For the foregoing reasons, plaintiff's Motion to Remand, ECF 17, is DENIED and the Commissioner's Motion to Affirm, ECF 19, is GRANTED.

This is not a recommended ruling. The consent of the parties allows a magistrate judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of Civil Procedure. Appeals from this judgment can be made directly to the appropriate United States court of appeals. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

SO ORDERED, this 23rd day of September, 2024, at Bridgeport, Connecticut.

*/s/ S. Dave Vatti*
S. DAVE VATTI
United States Magistrate Judge